# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

PVP ASTON, LLC (f/k/a 98 RA2 ) 
ASTON LIMITED PARTNERSHIP), ) 
RX FREDERICKSBURG ) 
INVESTORS L.L.C., RA2 ) 
MUSKEGON L.L.C., and ACA FSL ) 
HOLDINGCO, LLC, each a ) 
Delaware limited liability company, ) 
          ) 
          Plaintiffs, ) 
              v. )   C.A. No. N21C-09-095 AML CCLD 
          ) 
FINANCIAL STRUCTURES ) 
LIMITED, a company organized ) 
under the laws of Bermuda, and ) 
ASTON RA-357 LLC, ) 
FREDERICKSBURG RA-100 LLC, ) 
and MUSKEGON RA-357 LLC, each ) 
a Delaware limited liability company, ) 
          ) 
          Defendants. ) 

**Submitted: February 24, 2022**
**Decided: May 31, 2022**

## MEMORANDUM OPINION

**Upon Defendants' Motion to Strike Jury Demand,**
**DENIED WITHOUT PREJUDICE**
**Upon Defendants' Motion to Dismiss Plaintiff ACA FSL HoldingCo, LLC,**
**GRANTED**
**Upon Plaintiffs' Motion to Dismiss Affirmative Defenses,**
**GRANTED IN PART, DENIED IN PART**

Christopher P. Simon, Esq. and Michael L. Vild, Esq. of CROSS & SIMON, LLC, Wilmington, Delaware, *Attorneys for Plaintiffs PVP Aston LLC, RX Fredericksburg Investors LLC, RA2 Muskegon LLC, and ACA FSL HoldingCo LLC.*

Michael W. Teichman, Esq., Kashif I. Chowdhry, Esq., and Kyle F. Dunkle, Esq. of PARKOWSKI, GUERKE & SWAYZE, P.A., Wilmington, Delaware; Jeffrey D. Brooks, Esq. and Tanisha L. Massie, Esq. of MORRISON COHEN LLP, New York, New York, *Attorneys for Defendants Financial Structures Limited, Aston RA-357 LLC, Fredericksburg RA- 100 LLC, and Muskegon RA-357 LLC.*

**LEGROW, J.**

The plaintiffs in this action or their purported assignors owned properties subject to loans, secured by mortgages, and insured by policies that guaranteed the payment of the principal loan balance if the borrower defaulted. After the property owners defaulted on the loans, the insurer "purchased" the loans and mortgages from the lender in exchange for payment of the loan balance. The insurer then sold those loans to other buyers or foreclosed on the mortgages. The plaintiffs take the position the insurer's conduct violated the insurance policies, the loan documents, and other legal or equitable principles. This litigation followed.

There are now three pleadings-based motions pending before the Court. First, the defendants moved to strike the plaintiffs' jury trial demand, arguing the plaintiffs or their assignors waived their right to a jury trial. Because the Court cannot conclude that the jury trial waivers contained in the loan documents unambiguously extend to claims arising under the insurance policies, this motion is denied without prejudice to the defendants renewing their motion after discovery. Second, the defendants moved to dismiss one of the plaintiffs from this action on the ground that the purported assignment of rights to that plaintiff is barred by the anti-assignment clause in the insurance policies. Because the insurer did not consent to the assignment, it was void *ab initio* under the policies' terms, and that plaintiff does not have standing to proceed. Finally, the plaintiffs moved to strike three affirmative defenses raised in the defendants' answer: laches, estoppel, and *in pari delicto*. The

1

defendants agreed to withdraw their laches defense, and the plaintiffs' motion therefore is granted as to that defense. The other two defenses are proper defenses at law and cannot be dismissed at this stage in the proceedings. My reasoning follows.

## FACTUAL HISTORY AND PROCEDURAL BACKGROUND

### A. The Parties and the Loan Purchases

The following facts are drawn from the complaint and the documents it incorporates. Plaintiffs PVP Aston, LLC ("Aston Plaintiff"), RX Fredericksburg Investors LLC ("Fredericksburg Plaintiff"), and RA2 Muskegon LLC ("Muskegon Plaintiff") (collectively, "Borrower Plaintiffs")[1] purchased loans to finance the sale and leaseback of properties formerly owned by Rite-Aid drug stores (the "Properties").[2] Each property's acquisition was financed with a loan (the "Loan") borrowed from a Lender,[3] evidenced and secured by loan, mortgage, and related instruments encumbering all the realty and related assets owned by the applicable

---

[1] Aston Plaintiff is a Delaware limited liability company that owns Property in Aston, Pennsylvania, occupied by Rite Aid Corporation or an affiliate (either, "RAD") under a bond type net lease (each, a "Lease"). Compl. ¶ 24. Fredericksburg Plaintiff is a Delaware limited liability company that owns Property in Fredericksburg, Virginia, previously occupied by RAD under a Lease now expired. *Id*. ¶ 25. Muskegon Plaintiff is a Delaware limited liability company that owns a Property in Muskegon, Michigan, occupied by RAD as a holdover tenant under a Lease now expired. *Id*. ¶ 26.

[2] *Id*. ¶ 2.

[3] In 1998 and 1999, Defendant Financial Structure Limited, RAD and several lenders (each, together with its successors and assigns, a "Lender") created the Insureds (*see supra* n. 11) and dozens of similar prepackaged entities (each, a "1031 Entity") to be sold to investors who wished to participate in Internal Revenue Code Section 1031 tax-free exchange transactions. *Id*. ¶ 33.

obligor (collectively, the "Loan Documents").[4]  Pertinent to this case, the Loan

Documents for each of the Properties required all rents derived from the applicable

Lease to be applied to debt service on the applicable Loan, resulting in a "zero cash

flow."[5]  The Loans were insured for full payment by Defendant Financial Structures

Limited ("FSL") and secured by mortgages.[6]

## B. FSL's RVI Policies

To insure the Loan on each of the Properties, FSL issued residual value

insurance policies (the "RVI Polic(ies)").[7]  The Lenders required the purchase of the

RVI Polices.[8]  Each Lender was named as an "additional insured" in the applicable

RVI Policy, and in the event a claim was made under the Policy, payment was to be

remitted directly to the Lender.[9]

---

[4] *Id*. ¶ 2.

[5] *Id*. ¶ 37.  According to the Plaintiffs, this legal structure prevented the Borrower Plaintiffs and each Assignor, the respective borrowers of the loans, from accumulating reserves for the twenty-two-year term of the applicable Leases and associated Loans. *Id*.

[6] *Id*. ¶ 3. Defendant FSL is a Bermuda chartered insurance company that has offices in New York and conducts business in Delaware. *Id*. ¶ 29.

[7] *Id*. ¶ 4. FSL issued RVI Policy Number FSL-98-357-1274 to Aston Plaintiff, for which it paid FSL a premium of $37,426. *Id*. ¶ 34.  FSL issued RVI Policy Number FSL-99-100-3842 to Fredericksburg Plaintiff, for which it paid FSL a premium of $48,588.  *Id*. FSL issued RVI Policy Number FSL-98-357-4977 to Muskegon Plaintiff, for which it paid FSL a premium of $49,186. *Id*. RVI is a risk management tool that asset-based lenders use to manage the risk their collateral will depreciate faster than projected or will decline in value due to unexpected macroeconomic forces or other events. *Id*. ¶ 54.

[8] *Id*. ¶ 9.

[9] *Id*. Ex. A at 113 (Policy Sec. V) ("The Company will pay to the Additional Named Insured an amount equal to the Insured Value if: (i) a valid Notice of Claim has been given; (ii) the Additional Named Insured shall not have received payments in full of all amounts owing under the Loan; and (iii) all of the terms and conditions of this Policy have been satisfied.") Under the terms of the RVI Policies, only the Lenders - the "additional named insured" - could make a claim; the borrowers had no right to any claim or proceeds thereunder. *Id*. The RVI Policies provide that, upon payment

The RVI Policies were purchased by Borrower Plaintiffs and each Assignor,[10] the respective borrowers under the Loans and the insureds named in the applicable RVI Policies (each, an "Insured").[11] Each Insured was subject to "special purpose covenants" that provided the Insured only could own and operate one asset – the applicable Property – and that it was effectively prohibited from making any investments, borrowing any money other than the applicable Loan, engaging in any other business, granting liens on its Property, comingling funds with other entities, or declaring bankruptcy.[12] Additionally, both the Lender and FSL required each Insured execute an "Insured Covenants Agreement" (each, a "Forfeiture

---

of a claim to the Lender, FSL would gain several rights and remedies, including the right to be subrogated to the rights of the Lender against the borrower under the Loan Documents. Compl. Ex. A at 117 (Policy Sec. VIII(g)).

[10] Each Assignor is a limited liability company or other single asset entity that owned Properties in 1999 occupied by RAD under a Lease. Compl. ¶ 28.

[11] *Id*. ¶ 4. Each Insured was formed and required to be operated as a single purpose, single asset, "bankruptcy remote" entity. *Id*. ¶ 35. Borrower Plaintiffs argue, in this case, FSL's version of RVI was "an abusive, unconscionable and punitive perversion," encouraging FSL to convert all equity in all the assets of its own insureds to its own account for free. *Id*. ¶ 56. Borrower Plaintiffs raise issue with FSL's RVI because (i) the insurance contracts provide that if the insured loan is not timely paid off for any reason whatsoever, including *force majeure* events, FSL has the option of making an investment in the defaulted Loan as a form of alternative performance, enforcing the Loan Documents against the Borrower Plaintiffs and each Assignors as if there were no RVI; (ii) each RVI Policy is structured such that, if the very risk insured against occurs, FSL may acquire, for free through enforcement of the Forfeiture Agreements, all of each Insured's substantial equity in its Property in addition to enforcing the Loan Documents and recouping every dollar of "claims" or "Loan purchase price" FSL pays; and (iii) the language and structure of each RVI Policy intentionally obscures the previously described features in a manner such that no reasonable person would anticipate or expect the FSL version of the RVI is unfair and inequitable. *Id*. ¶¶ 57-59.

[12] *Id*. ¶ 36.

4

Agreement"), which provided that upon default of the applicable Loan, the Insured automatically would forfeit to FSL all equity in the Properties.[13]

### 1. Payment Specification

Each applicable Loan and corresponding Lease was designed to end at the same time.[14] Such a structure disallows a "tail" of lease term that extends beyond the maturity date of the applicable loan.[15] Borrower Plaintiffs contend this structure makes payment at the maturity date challenging.[16] As previously mentioned, FSL guaranteed payment of the balloon payment[17] due upon maturity of the note. In the event the borrower defaulted on that payment, the Lenders could make a claim to FSL under the RVI Policies.[18]

---

[13] *Id.* ¶ 5; Compl. Ex. A. Borrower Plaintiffs contend that under the Forfeiture Agreements, FSL seeks to retain the millions in premiums it received and invested for twenty-two years as well as any amount it funded for Loan purchases under the RVI Policies and all the equity that has accrued in the Properties for the twenty-two years they have been owned by the Insureds. Compl. ¶ 89. Further, Borrower Plaintiffs argue because of the Forfeiture Agreements, if triggered, each Insured is forced immediately to forfeit all its interest in Property to FSL or its successor with no equity of redemption or payment of any kind from FSL or its successor in consideration of the Insured's equity. *Id.* ¶ 97.

[14] *Id.* ¶ 38.

[15] *Id.*

[16] *Id.* In a single net lease structure, which Borrower Plaintiffs contend exists here, income becomes zero at lease expiration, the "precise time that the lender's balloon payment at maturity is due." *Id.* ¶ 39.

[17] The balloon payments were due as follow: (i) on September 1, 2020, for Aston Plaintiff and Muskegon Plaintiff; (ii) on January 1, 2021, for Fredericksburg Plaintiff; and (iii) on the applicable date in Plaintiff's Complaint Ex. C for each Assignor, the balloon payment became due under the applicable Loan Documents. *Id.* ¶ 51. According to Borrower Plaintiffs, FSL was assured it could invest the premium dollars with compound returns thereon, without risk of loss or any cost for the entirety of the twenty-two year period. *Id.* ¶ 10. The total value today of FSL's investment assuming a compounded 6% annual yield from 1998 to the first maturity date to occur in respect of any Loan is estimated by Borrower Plaintiffs to be $4,700,000. *Id.* ¶ 11.

[18] *Id.* ¶ 9; Compl. Ex A at 113 (Policy Sec. V).

## 2. The RVI Policy Section V Language

Plaintiffs take issue with Section V of the RVI Policies. Section V(d) of the RVI Policies, according to Plaintiffs, gives FSL the option to render an alternative form of performance of its insurance claim payment obligations.[19] Specifically, Section V(d) of the RVI Policies reads:

> In the event that the Company is obligated in accordance with the terms and conditions of this Policy to make payment to the Additional Named Insured, on the Termination Date (and at any time thereafter) the Company shall have the option in its sole discretion, in lieu of complying with Article I and Article V of the Policy,[20] to purchase the Loan from the Additional Named Insured for a purchase price equal to all amounts payable under the Loan, but in no event greater than the Insured Value. The Company may exercise such option by giving written notice to the Insured and the Additional Named Insured and making payment of the purchase price to the Additional Named Insured within the time provided in Article V(c)[21] hereof. If the Company exercises such option, the Additional Named Insured will assign the Loan and all documents evidencing or securing the Loan to the Company, without recourse, in accordance with the provisions of Section 8 of the Additional Named Insured Endorsement. Upon completion of such transfer and payment by the Company as provided herein, any and all liability of the Company under the Policy shall terminate. In any event, if the Loan is not outstanding on the

---

[19] Compl. ¶ 66.

[20] Article I of the Policy is the Agreement of Insurance; Article V is Payment of Insured Value. Compl. Ex. A at 109, 113. (Policy Sec. I; Policy Sec. V).

[21] "The Company shall endeavor to make any payment payable under Article V(a) or V(d) hereof on the same day a valid Notice of Claim is received by the Company. In all events if a Notice of Claim is received by the Company not less than three (3) Business Days prior to the Termination Date, the Company will make payment hereunder on the Termination Date, and if a Notice of Claim is received by the Company less than three (3) Business Days prior to the Termination Date payment shall be made within three (3) Business Days after receipt of the Notice of Claim." Compl. Ex. A at 113-114 (Policy Sec. V(c)).

Termination Date, any and all liability of the Company under the Policy shall terminate.[22]

According to Plaintiffs, Section V(d) of the RVI Policies allows FSL not to pay the claim it was compensated by the Insured to assume but allows the claim to remain extant and unpaid. FSL then can invest in or buy that very claim and auction it off, or itself enforce it to the fullest extent against the Insureds.[23]

### 3. The Anti-Assignment Clause

The RVI Policies also contained an anti-assignment clause (the "Anti-Assignment Clause"), which is relevant to Defendants' Motion to Dismiss Plaintiff ACA FSL Holdingco, LLC ("ACA Plaintiff") from this action. Section VIII(a) of each RVI policy provides:

> This is a personal contract and neither this Policy nor the Insured's or Additional Insured's rights under this Policy may be assigned without the prior written consent of the Company and any such purported assignment shall be null and void *ab initio* . . . .[24]

---

[22] *Id*. at 114 (Policy Sec. V(d)).

[23] Compl. ¶ 69. Borrower Plaintiffs contend under Section V(d) of the RVI Policies, FSL's choice upon Loan default is either (i) pay a claim and recognize the transaction as a business expense or loss with no chance to recoup any of the claim payment; or (ii) exercise in its sole discretion its option and buy a claim, enforce that claim, and recover from the Insured. *Id*. ¶ 72. Borrower Plaintiffs therefore contend FSL removed any real insurance benefit to the Insured from the RVI Policies, while creating a new investment opportunity for itself to foreclose on the Properties and make them FSL's properties. *Id*. ¶ 75. This language, according to Borrower Plaintiffs, was intentionally crafted by FSL to appear and operate in a deceptive manner. *Id.* ¶ 79. Additionally, Borrower Plaintiffs argue a requirement exists that FSL give written notice of its determination to exercise the option to both the Insureds and the Lenders before paying a claim made by a Lender, but FSL never issued the written notice to the Insured and Lenders and the time to has now expired. *Id*. ¶¶ 115-116. Borrower Plaintiffs contend this failure to provide written notice as required by Section V(d) of each RVI Policy makes FSL's exercise of the options to purchase the Loans instead of paying them off void and ineffective. *Id*. ¶ 119.

[24] Compl. Ex. A at 115 (Policy Sec. VIII(a)).

This clause goes on to list a number of exceptions that permit assignments by the Lender, assignment to any person or entity acquiring title to the Property under the terms of the applicable mortgage, and assignment upon a change in the insured entity's beneficial ownership.[25] None of those exceptions applies in this case.

## C. The Series and Jury Waiver Provisions

The Loan Documents fall within one of four Series: Series 100, Series 320, Series 357, and Series 379.[26] These Loan Documents, which include RVI Policy purchase provisions, contain express jury waiver clauses precluding all demands for trial by jury as to any claim relating to the Loan Documents or "other action arising in connection therewith."[27] Specifically, the language for the Series 100 and 320 Loan Documents states:

> "**WAIVER OF JURY TRIAL. GRANTOR AND BENEFICIARY[28] EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE NOTE, THIS INDENTURE, OR THE OTHER SECURITY DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND**

---

[25] Defs.' Answ. Br. in Opp'n. to Mot. Dismiss the Claims of Pl. ACA FSL Holdingco, LLC (hereinafter Defs.' Answ. Br. in Opp'n. to Mot. Dismiss) at 11-13.

[26] Defs.' Mot. to Strike Pls.' Jury Demand (hereinafter Defs.' Mot. to Strike) at 5. According to FSL, the pertinent Loan Documents within a Series are substantively identical.

[27] *See, e.g*., Defs.' Mot. to Strike at 7, Fredericksburg, Part I. 56 (Ex. B-1 at A050).

[28] For Series 320, the phrase is "Borrower and Lender" instead of "Grantor and Beneficiary," but the language otherwise is identical to that of Series 100. *Compare* Fredericksburg, Part I. 56 (Ex. B-1 at A050) *with* Ironton, Part II. 56 (Ex. B-2 at A123).

**VOLUNTARILY BY BENEFICIARY AND GRANTOR[29] AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. GRANTOR AND BENEFICIARY[30] ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GRANTOR OR BENEFICIARY.[31]**

Similarly, the language for Series 357 and 379 states:

> "*Waiver of Jury Trial*. Each of the parties hereto hereby intentionally, knowingly, voluntarily, expressly and mutually waive any right to trial by jury of any claim, demand, action or cause of action arising under any Operative Document or in any way dealing with or incidental to the dealings of the parties hereto or with respect to any of the Operative Documents or the transactions contemplated thereby, in each case whether now existing or hereafter arising and whether in contract or tort or otherwise."[32]

### D. Conflict at Loan Maturation

The Loans matured during the COVID-19[33] pandemic; as a consequence in part of the pandemic's financial effects, the Loans were not paid in full.[34] All but five of the applicable Leases had limited five-year renewal options.[35]  Each Lender

---

[29] For Series 320, the phrase is "Lender and Borrower" instead of "Beneficiary and Grantor," but the language otherwise is identical to that of Series 100. *See supra* n. 28.

[30] For Series 320, the phrase is "Borrower and Lender" instead of "Grantor and Beneficiary," but the language otherwise is identical to that of Series 100. *See supra* n. 28.

[31] Defs.' Mot. to Strike, Fredericksburg, Part I. 56 (Ex. B-1 at A050) (emphasis original).

[32] Defs.' Mot. to Strike, Baltimore-Harford, Art. 14 § 14.03 (Ex. B-3 at A171); Hodgenville, Art. 14 § 14.03 (Ex. B-4 at A236).

[33] Coronavirus disease 2019 ("COVID-19") is an illness caused by a novel coronavirus called severe acute respiratory syndrome coronavirus 2. www.CDC.gov (last visited Feb 16, 2022).

[34] Compl. ¶ 13.

[35] *Id*. ¶ 40. Borrower Plaintiffs contend a short extension period is unattractive and highly disfavored by "take-out lenders," who look for at least ten-year extension terms to assure enough of a lease "tail" to pay off the loans or refinance at maturity. *Id.*

was paid all outstanding amounts due on such Loans by FSL or a nominee of FSL following payment demands.[36] The Loan Documents then were assigned to FSL's nominees, which became the Lenders under the Loan Documents.[37] FSL's nominees subsequently sold a number of the loans to buyers that then became the new "Lenders" under the applicable Loan Documents for those loans.[38]

Relying on Section V(d) of the RVI Policies, FSL contended its payments to the Lenders did not pay off or satisfy the insured Loans.[39] Borrower Plaintiffs and ACA Plaintiff (collectively, "Plaintiffs") took the position all the Loans were paid in full and fully discharged by FSL under applicable provisions of the RVI Policies.[40]

---

[36] *Id*. ¶ 13.

[37] *Id*. ¶ 17. Borrower Plaintiffs contend the consequences of the applicable Loan Documents being assigned instead of paid off are far worse than having paid for insurance coverage that was "worthless and having to defend a fairly-conducted foreclosure action" where at least the Insured would be entitled to any surplus proceeds of its Properties. *Id*. ¶ 87.

[38] *Id*. ¶ 46. As a result, Borrower Plaintiffs contend FSL was assured it could invest premium dollars, with compound returns theron, without risk of loss or any cost for the entirety of the twenty-two-year period.[38] *Id*. ¶ 10. Borrower Plaintiffs further contend FSL was (i) aware the structure of the Loans would likely result in a substantial number of defaults at the time of loan maturity; (ii) FSL did not consider or suggest changes to the transaction structure of the Loans or Leases to minimize the likelihood of default by its Insureds; and (iii) FSL remains content to "insure" its portfolios with more defaults. *Id*. ¶¶ 42-44. According to Borrower Plaintiffs, each default provided FSL with another opportunity to appropriate its own insured's equity for free or make outsized profits at the expense of its Insureds by selling the Loan Documents and Forfeiture Agreements at a profit. *Id*. ¶ 45.

[39] *Id*. ¶ 15. Borrower Plaintiffs argue Defendants claimed payments made to Lenders constituted the "purchase price" paid for the acquisition of the Loan Documents and the purchases were each made pursuant to an option set forth in the applicable RVI Policy to acquire the Loan Documents in lieu of fulfilling FSL's obligation to pay off the Loans. *Id*. ¶ 16. According to Borrower Plaintiffs, FSL's position is that through its purchase of the Loan Documents pursuant to options, FSL or its nominees replaced the position of the Lenders, and all Loan Documents could still be enforced against applicable Properties along with all Insureds that purchased the RVIs. *Id*. ¶ 17.

[40] *Id*. ¶ 18.

After this disagreement arose, thirty-two different entities assigned to ACA Plaintiff all their "right, title and interest in and to any and all claims . . . arising from or relating in any manner to (i) the RVI Policies or the enforceability or absence thereof . . . (iii) the Loan Documents or the enforceability or the absence thereof; and (iv) the acts or omissions of FSL or any Nominee in respect of any matter or thing comprehended in [the preceding clauses]" (the "Assigned Claims").[41] Like the Borrower Plaintiffs, each of the purported assignors (collectively, the "Assignors") was a borrower under loan documents securing property improved as a drug store and for which FSL issued RVI policies.[42] Accordingly, each of the Assignors was an "Insured" under the RVI Policy issued for the property owned by that entity.

## E. Filings in this Court

On September 13, 2021, the Plaintiffs filed this action against Defendants and demanded a jury trial.[43] Plaintiffs seek declaratory relief that the purchase of each set of Loan Documents by FSL or its nominee was invalid due to (i) failure by FSL to comply with all conditions precedent to the exercise of the option rights set forth in each RVI Policy; (ii) FSL's material and continuing breach of each RVI Policy by not providing appraisal information when required; and (iii) the option rights and

---

[41] *Id*. ¶ 7; Compl. Ex. B.  (All the assignments contained identical language).
[42] Compl. Ex. B-C.  Each of the thirty-two entities assigned their claims to either Allerand Realty Holdings, LLC or RA2 Holdings, LLC.  Those two entities then assigned those claims to ACA Plaintiff.  *Id*. Ex. B.
[43] *See* Compl.

11

other provisions of each RVI Policy being unenforceable, void *ab initio*, and in violation of numerous laws and doctrines relating to mortgages, insurance and insurers.[44] Additionally, Plaintiffs seek declaratory relief, pursuant to the language of the RVI Policies, that (i) the actual payments FSL or any nominee made as consideration for the purchase of any Loan Documents were proceeds of the insurance FSL was obligated to provide to Insureds and Lenders, to be applied to satisfy and not to purchase Loan Documents; and (ii) accordingly, all indebtedness and purported obligations of Insureds evidenced and secured by all Loan Documents was extinguished.[45] Plaintiffs also seek a further declaration that the Forfeiture Agreements are "unconscionable, unenforceable and void *ab initio*" as well as disgorgement of all funds received by FSL or any nominee relating to the refinancing or sale of any Loan Documents purportedly owned by FSL or any nominee and acquired pursuant to any option provision set forth in any RVI Policy.[46]

In response to the initial filing, Defendants filed two motions: (i) a motion to strike Borrower Plaintiffs' jury demand[47] (the "Motion to Strike") and (ii) a motion to dismiss Plaintiff ACA FSL HoldingCo, LLC (the "Motion to Dismiss Plaintiff ACA").[48] Plaintiffs in turn filed a motion to dismiss Defendants' affirmative

---

[44] *Id.* ¶ 19.
[45] *Id.* ¶ 20.
[46] *Id.* ¶¶ 21-22.
[47] D.I. 15. Defendants contend the Loan Documents are at issue in this case and contain valid jury waivers provisions.
[48] D.I. 17.

defenses (the "Motion to Dismiss Affirmative Defenses") on December 10, 2021, in response to Defendants' Answer.[49] The parties briefed and argued all three motions.

## F. Parties' Contentions

In their Motion to Strike, Defendants contend Plaintiffs' claims touch upon the Loan Documents as well as the RVI Policies and therefore are subject to the jury waivers found in every transaction Series.[50] Plaintiffs, Defendants argue, waived their rights to trial by jury under the waivers' plain and unambiguous terms and are not permitted to demand a jury hear their claims in this case.[51] In their Motion to Dismiss ACA Plaintiff, Defendants first contend ACA Plaintiff has no standing in this case because it is not an assignee under any assignment of rights.[52] Any such purported assignments, according to Defendants, are void and ineffective under the Anti-Assignment Clause's terms.[53] Defendants also argue ACA Plaintiff's claims must be dismissed because the purported assignments represent claim splitting, and two entities that purportedly assigned their rights to ACA Plaintiff previously brought claims against FSL in the United States District Court in Texas; those claims, "nearly identical" to the claims here, were dismissed with prejudice.[54]

---

[49] D.I. 32

[50] Defs.' Mot. to Strike at 11. Each set of Loan Documents explicitly requires the acquisition of an RVI Policy as a condition of the loan transaction. *Id*. at 5.

[51] *Id*.

[52] Defs.' Mot. to Dismiss the Claims of Pl. ACA FSL Holdingco, LLC (hereinafter Defs.' Mot. to Dismiss) at 2.

[53] *Id*.

[54] *Id*.

In their Motion to Dismiss Defendants' Affirmative Defenses, Plaintiffs allege this Court does not have jurisdiction to consider several of the raised affirmative defenses because they are equitable defenses.[55]  Plaintiffs challenge three of those defenses on the basis that they arise in equity and therefore fall outside this Court's jurisdiction.[56]  Specifically, Plaintiffs move to strike the defenses of laches, estoppel, and *in pari delicto*.[57] In response to this motion, Defendants agreed to withdraw their laches defense but asserted estoppel and *in pari delicto* are proper defenses at law.[58]

## ANALYSIS

### I.  Defendants' Motion to Strike is deferred until discovery concludes.

To support its position that Plaintiffs waived their jury trial rights, Defendants argue the jury waivers contained in Series 100 and 320 Loan Documents are (i) identical, (ii) utilize the same defined terms and operative language, and (iii) provide a broad waiver of any right to trial by jury for any issue "with regard to the Note, this Indenture, or the Other Security Documents" as well as "any claim, counterclaim, or other action arising in connection therewith."[59] Defendants contend

---

[55] Pls.' Mot. to Strike Defs.' Affirmative Defenses (hereinafter Pls.' Mot. to Strike) ¶ 4. Specifically, the Motion asks this Court to dismiss Defendants' third, nineth, and eleventh defenses, which are: the doctrine of laches; estoppel; and in *pari delicto*. *Id*. ¶ 3.

[56] *Id*.

[57] *Id*.

[58] Defs.' Resp. to Pls.' Mot. to Strike Defs.' Affirmative Defenses (hereinafter Defs.' Resp. to Pls.' Mot. to Strike) ¶ 2.

[59] Defs.' Mot. to Strike at 11; Fredericksburg, Part I. 56 (Ex. B-1 at A050); Irontron, Part II. 56 (Ex. B-2 at A123).

the RVI Policies, from which Plaintiffs' claims arise, qualify as "Other Security Documents" because the RVI Policies are "documents…executed and/or delivered in connection with" the Loan Documents.[60] Further, the Series 100 and 320 Loan Documents explicitly required purchase of RVI Policies, and therefore any claim arising out of the Loan Documents or the RVI Polices purchased pursuant thereto necessarily "aris[es] in connection" with the Loan Documents and is subject to the jury trial waiver.[61]

Defendants likewise contend jury waivers within the Series 357 and 379 Loan Documents are (i) identical, and (ii) utilize the same defined terms and operative language as those found in Series 100 and 320.[62] The term "Operative Documents," Defendants argue, used in the 357 and 379 Series, is defined to include the Loan Agreement;[63] Plaintiffs' claims arising from 357 and 379 Loan Documents constitute claims "dealing with" or "with respect to" a "transaction contemplated by" the "Operative Documents," and those claims therefore are subject to the jury waiver.[64] The Series 357 and 379 Loan Documents also explicitly required purchase of RVI Policies, making claims under the RVI Policies, according to Defendants' interpretation, claims "dealing with" or "with respect to" a "transaction

---

[60] *Id*. at 12; Ironton, Part II. I(b) (Ex. B-2 at A082); Fredericksburg, Part I.1(b) (Ex. B-1 at A008-09).
[61] Defs.' Mot. to Strike at 12.
[62] *Id*.
[63] *Id*. at 13; Baltimore-Harford, Ex. A (Ex. B-3 at A191); Hodgenville, Ex. A (Ex. B-4 at A270).
[64] Defs.' Mot. to Strike at 13.

contemplated by" the "Operative Documents."[65] Defendants also seek attorneys' fees in connection with their Motion to Strike, arguing Plaintiffs engaged in conduct that "needlessly increased Defendants' litigation costs," and that fee shifting "is therefore appropriate to compensate Defendants and deter similar conduct in the future."[66]

In response, Plaintiffs argue the jury trial waiver applies to claims arising from "the note…or the other security documents or any claim, counterclaim or other action arising in connection therewith," and the claims in this case are unrelated to the note.[67] For support, Plaintiffs turn to the Loan Documents' "*Definitions and Rules of Usage,*" which states "'Operative Documents' shall mean the Lease, the Lease Assignment, the Guaranty, the Secured Note, the Mortgage, the Subordination, Non-Disturbance and Attornment Agreement, the Consent Agreement and the Loan Agreement."[68] Plaintiffs contend they are not making claims under any of those documents, and instead seek relief arising from FSL's

---

[65] *Id.*

[66] *Id.* at 18.

[67] Pls.' Answ. Br. in Opp'n. to Def.s' Mot. to Strike Jury Demand (hereinafter Pls.' Answ. Br. in Opp'n to Mot. to Strike) at 8. Specifically, Plaintiffs contend the claims in their Complaint "arise out of or relate exclusively to the insurance agreements attached to the Complaint that the Defendants issued in connection with certain financial transactions." *Id.* at 2. Those documents include: (i) the Residual Value Insurance Policy; (ii) the Residual Value Insurance Declaration; (iii) the Residual Value Insurance Application; (iv) the Additional Named Insured Endorsement; (v) the Forfeiture Agreement; and (vi) the Contract Provisions, none of which, Plaintiffs contend, contain jury waivers. *Id.* Plaintiffs refer to these documents collectively as the "Insurance Documents." *Id.*

[68] Pls.' Answ. Br. in Opp'n. to Defs.' Mot. to Strike at 9 (citing App. of Defs.' Mot. to Strike, Ex. B-4 A270).

conduct related to the Insurance Documents, which do not contain jury waivers.[69]

Since the Loan Documents do not incorporate the Insurance Documents, Plaintiffs contend, and the Insurance Documents do not contain jury waivers, Plaintiffs may demand a jury trial in the instant case.[70] Further, Plaintiffs point out FSL was (i) not a party to the Loan Documents, and (ii) the rights and obligations under the Loan Documents and the Insurance Documents are distinct and separate.[71] Lastly, Borrower Plaintiffs argue this Court should reject Defendants' demand for fee-shifting because there is no evidence Plaintiffs engaged in "bad faith, acted vexatiously, multiplied this litigation, unfairly increased the costs, knowingly asserted frivolous defenses, or changed their position."[72]

Further complicating Defendants' Motion to Strike is the fact that not all the Loan Documents contain a Delaware choice of law clause. At least one of the transactions arising under the Series 320 Loan Documents selected California law to govern the transaction.[73] FSL argues the transaction involves property located in Blythe, California, (the "Blythe Transaction") and was executed in 1998, when

---

[69] *Id.* at 9 (citing *Tekni-Plex, Inc. v. LLFlex, LLC*, 2021 WL 1574780, at * 3 (Del. Super. Apr. 22, 2021)) (comparing jury trial waiver language in different agreements and finding that a jury trial waiver was limited to claims arising only a defined term to a specific purchase agreement); *Id.* at 10.

[70] *Id.* at 11.

[71] *Id.* at 9. Borrower Plaintiffs additionally allege the Insurance Documents are unconscionable and illusory, since Borrower Plaintiffs received no benefit for the premiums they paid. *Id.* at 10.

[72] *Id.* at 15.

[73] Defs.' Mot. to Strike at 14, Exhibit C: List of Choice-of-Law Jurisdictions.

California law recognized contractual jury waivers in commercial agreements provided they were clear and unambiguous.[74] California's recognition of such waivers changed in *Grafton Partners v. Superior Court,* 116 P.3d 479, 486 (Cal. 2005), when the California Supreme Court held pre-dispute jury waivers are not valid under California law.[75] Defendants contend Delaware law should control the Blythe Transaction because (i) Plaintiffs are all Delaware entities, (ii) Plaintiffs chose Delaware as their forum for this litigation, and (iii) Delaware recognizes and enforces contractual jury waivers in commercial agreements involving sophisticated parties, such as those in this case.[76] Defendants argue this dispute involves contract law, where the protection of "justified expectations" is important and "should not be disappointed by application of the local law rule of a state which would strike down the contract" or the contract's provisions.[77]

Plaintiffs contend the Defendants' choice of law argument is moot because the Insurance Documents are the relevant agreements in dispute and, unlike the Loan Documents, did not contain choice of law provisions that adopt differing states' laws.[78] After review, I find the jury waivers in all four Series to be ambiguous.

---

[74] *Id*. at 15. *See Trizec Properties Inc. v. Superior Ct.,* 280 Cal. Rptr. 885, 887 (Ct. App. 1991).

[75] Defs.' Mot. to Strike at 15.

[76] *Id*. at 16 (citing, e.g., *The Data Ctrs., LLC, v. 1743 Holdings LLC*, 2015 WL 6662107, at *7 (Del. Super. Oct. 27, 2015)).

[77] *Id*. at 17 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS (hereinafter Restatement Second) § 188 cmt. b).

[78] Pls.'s Answ. Br. in Opp'n. to Defs.' Mot. to Strike at 11. Additionally, Borrower Plaintiffs include in their brief a discussion of how this Court should rule concerning FSL's argument of

Therefore, I defer Defendants' Motion to Strike until after discovery and will not award attorneys' fees.

### A. The jury waivers in the Loan Documents are susceptible of more than one reasonable interpretation.

Delaware courts recognize the right to a jury trial in certain civil actions.[79] A party may, however, waive that right by contract.[80] Delaware courts narrowly construe jury trial waivers, but routinely enforce unambiguous waivers.[81] When determining whether a contract effectively waives a jury trial right, this Court must consider: (i) the negotiability of the contract terms; (ii) disparity in bargaining power between parties; (iii) business acumen of the party opposing the waiver; and (iv) the conspicuousness of the jury waiver provision.[82] But even if all these considerations favor a finding of waiver, the Court will not uphold a waiver provision unless it is

---

Delaware choice of law. Borrower Plaintiffs contend the Blythe transaction should be governed by California law. ("Here, the parties to [the] Loan in the Blythe transaction made an effective choice of California law in their contract. That fact ends the analysis: the California rule prohibiting pre-dispute jury trial waivers applies to that transaction."). *Id*. at 12. Borrower Plaintiffs go on to argue that the Restatement Second's §§ 188 and 193 factors would weigh in favor of applying California law if the Court conducted that analysis. *Id.* at 13.

[79] Those civil actions include claims involving breach of contract. *See e.g., McCool v. Gehret*, 657 A.2d 269, 282 (Del. 1995) ("Accordingly, the right to a jury trial in civil proceedings has always been and remains exclusively protected by provisions in the Delaware Constitution."). *See also* Article 1, § 4 of the Delaware Constitution.

[80] *In re DaimlerChrysler AG Sec. Litig.*, 2003 WL 22769051, at * 1 (D. Del.), aff'd, 502 F.3d 212 (3rd Cir. 2007); *The Data Ctrs., LLC v. 1743 Holdings LLC*, 2015 WL 6662107, at *3 (Del. Super. Oct. 27, 2015) ("Where a party effectively waives its right to trial by jury in a contract, the Court may, upon motion, strike the party's demand for a jury trial from the pleading.").

[81] *Tekni-Plex, Inc. v. LLFlex, LLC*, 2021 WL 1574780, at *2 (Del. Super. Del. Super. Apr. 22, 2021).

[82] *CIT Commc'ns Fin. Corp. v. Level 3 Commc'ns, LLC*, 2008 WL 2586694, at ¶ 18 (Del. Super. June 6, 2008).

19

clear and unambiguous.[83] If the provision meets all these conditions, then the Court will "look no further than the four corners of the document memorializing the waiver to construe its meaning and effect."[84] Where a waiver provision is ambiguous, however, the Court defers ruling on a motion to strike a jury demand until after discovery.[85]

An unambiguous provision in a contract is one that is susceptible of only one reasonable interpretation.[86] Under Delaware law, an interpretation is *unreasonable* if it produces (i) an absurd result or (ii) a result that no reasonable person would have accepted at the time of entering the contract.[87] The success of Defendants' argument turns on whether this Court finds the jury waivers in the Loan Documents subject to more than one reasonable interpretation, rendering them ambiguous.[88]

---

[83] *Id.* (citing *In re: DaimlerChrysler AG Sec. Litig.,* 2003 WL 22769051, at * 2 (D. Del. 2003)) ("Reading the plain and unambiguous language of the… agreement, I find, without question, that the jury trial waiver is enforceable.").

[84] *CIT Commc'ns. Fin. Corp.*, 2008 WL 2586694, at ¶ 18.

[85] *The Data Ctrs., LLC*, 2015 WL 6662107, at * 4 ("Where a waiver provision is ambiguous, the Court will defer ruling on a motion to strike a jury demand until after discovery, because 'fairness warrants that a decision [regarding the scope of ambiguous jury waiver provisions] be deferred until after discovery is complete.'") (internal citations omitted)).

[86] *See BLGH Holdings LLC v. enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012) ("Where, as here, the plain language of a contract is unambiguous *i.e.,* fairly or reasonably susceptible to only one interpretation, we construe the contract in accordance with that plain meaning and will not resort to extrinsic evidence to determine the parties' intentions.") (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[87] *Manti Holdings, LLC v. Authentix Acquisition Co., Inc*., 261 A.3d 1199, 1208 (Del. 2021). *See also*, *Obsborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[88] *Manti Holdings, LLC*, 261 A.3d at 1208 (internal citations omitted). The mere fact parties disagree over the contract's interpretation does not suffice to establish ambiguity. *Id*. at 1214 (internal citations omitted).

Defendants' proffered interpretation of the jury trial waiver is reasonable. The Loan Documents waive any right to trial by jury with regard to "Operative" or "Other Security Documents," the specific kind dictated by the Series, and any action arising in connection with those documents. Because the Loan Documents required purchase of RVI Policies, it is reasonable to interpret the waivers contained in those documents as applying to Plaintiffs' claims because a reasonable person could anticipate at signing that the RVI Policies qualified as "Operative" or "Other Security Documents" to the Loan Documents. Any claim arising in connection with those documents, therefore, could be understood to be subject to the jury waiver.

The analysis, however, does not end there. The waiver provisions nevertheless are ambiguous because Plaintiffs' interpretation of the jury trial waivers as applying only to the Loan Documents and not to the Insurance Documents *also* is reasonable, particularly in the context of the narrow construction accorded such waivers. Plaintiffs' position, like Defendants', does not produce an absurd result. The jury waiver provisions do not contain language that expressly incorporates the Insurance Documents. The Insurance Documents, although related to the Loans, governed separate transactions the borrowers entered into with FSL. FSL, in turn, was not a party to the Loan Documents. A reasonable person, at the time of signing, could have understood the jury waivers in those documents as applying only to the Loan Documents and not the Insurance Documents Plaintiffs contend are at issue

21

here. Therefore, because the jury waiver provisions are subject to more than one reasonable interpretation, those provisions are ambiguous, and Defendants' Motion must be deferred until after discovery.

Defendants contend Plaintiffs' interpretation is not reasonable, and that the Court should find Defendants' interpretation is the only reasonable one, insisting that Plaintiffs' claims concern the Loan Documents.[89] Defendants rely on *The Data Centers, LLC v. 1743 Holdings LLC*[90] for their position that the jury trial waivers apply to Plaintiffs' claims because the Loan Documents and RVI Policies "comprise one interconnected overarching transaction," and the waivers encompass actions arising in connection with that transaction.[91]

In *Data Centers*, this Court struck a demand for jury trial due to waivers found in an Indemnity Agreement, which expressly extended the waivers to claims involving any documents "in connection with" the Indemnity Agreement.[92] The plaintiff argued it had a right to a jury trial for a claim involving a Lease Agreement because the language "in connection with" was ambiguous. The *Data Centers* Court held otherwise, finding a claim involving the Lease Agreement was a claim "in connection with" the Indemnity Agreement.[93] Defendants contend *Data Centers*

---

[89] *See* Defs.' Mot. to Strike at 11.

[90] 2015 WL 6662107 (Del. Super. Oct. 27, 2015).

[91] Defs.' Reply Br. in Supp. of Defs.' Mot. to Strike Pls.' Jury Demand (hereinafter Reply Br. in Supp. of Defs.' Mot. to Strike) at 1-3.

[92] *The Data Ctrs., LLC*, 2015 WL 6662107, at * 5.

[93] *Id*.

compels the conclusion that the waivers at issue here unambiguously apply to Plaintiffs' claims. But there are several key differences between the jury waivers found in *Data Centers* and the jury waivers at hand. First, in *Data Centers*, the Indemnity Agreement physically was attached to the Lease as "Exhibit C" during signing.[94] In fact, those two documents were numbered sequentially, further suggesting they were part of a single transaction.[95] Second, the Lease expressly referred to the Indemnity Agreement.[96]

Here, in contrast, the Insurance Documents and the Loan Documents were not attached to one another at the time of signing. The waivers in the Loan Documents do not expressly reference the Insurance Documents. The organization of the Loan Documents and the Insurance Documents, when compared, does not indicate an intent of continuation. It is not unreasonable to view the Loan Documents and the Insurance Documents as separate agreements governing separate, though related, transactions. Further, Defendants were not original parties to the Loan Documents.[97]

---

[94] *Id.*

[95] *Id.* The Indemnity Agreement found in *Data Centers* began at Section 45 rather than Section 1.

[96] *Id.*

[97] Although not dispositive of whether the jury trial waivers extend to Plaintiffs' claims against FSL, the fact that FSL was not a party to the documents containing the waivers is relevant to the analysis. First, it is relevant to whether a reasonable person would expect the waivers to apply to the Insurance Documents. Second, it is relevant to whether the waivers truly extend to claims arising under those documents. That is, Defendants' interpretation likely would make the jury waivers unilateral as to claims arising under the Insurance Documents, since it is unlikely a court would find FSL waived its jury trial rights in documents to which it was not a signatory. *See Seaford Assoc. v. Hess Apparel, Inc.,* 1993 WL 258723 (Del. Super. June 22, 1993). Defendants again rely on *Data Centers* for their position that FSL's non-signatory status is irrelevant. But, as

And Plaintiffs persuasively argue that the Insurance Documents' drafters were capable of inserting a jury trial waiver into the documents, as demonstrated by their existence in the Loan Documents. The drafters did not. For these reasons, I conclude the waivers are susceptible of two reasonable interpretations, and I deny Defendants' Motion without prejudice to a motion filed after discovery concludes.

**B. Defendants' argument concerning the choice-of-law for the Blythe Transaction is moot because the jury waivers are ambiguous.**

Unlike the Insurance Documents, the Loan Documents contain choice of law provisions that adopt different states' laws. Defendants concede that, if California law applies, the jury trial waiver in the Blythe Transaction would be unenforceable because pre-dispute jury waivers are now unenforceable under California law. But Defendants argue this Court should apply Delaware law to that transaction and preclude Plaintiffs from demanding a jury trial. The choice of law question is moot unless and until the Court concludes the jury trial waivers apply to Plaintiffs' claims.

**II. ACA Plaintiff lacks standing to pursue any claims because the purported assignments are barred by the Anti-Assignment Clause.**

In their Motion to Dismiss ACA Plaintiff for lack of standing, Defendants contend (i) the Anti-Assignment Clause bars assignment of the Policy or any rights thereunder without FSL's prior written consent; (ii) FSL did not consent to the purported assignments to ACA Plaintiff; and (iii) the assignments therefore are void

---

outlined above, that case is distinguishable. Again, these issues support the conclusion that the waivers are ambiguous.

*ab initio*. Defendants alternately argue ACA Plaintiffs' claims must be dismissed for improper claim splitting. Defendants contend the Assignors' attempt to retain for themselves the right to bring the same claims against any party to which FSL transferred its rights improperly separates claims arising from the same transaction, giving the would-be plaintiffs "two bites at the apple."[98]

Plaintiffs respond that Defendants' motion is nothing more than an effort to delay and increase the cost of these proceedings. Even if the assignments were void, Plaintiffs argue, the Assignors could themselves assert the same claims in this action. But Plaintiffs insist the assignments were valid, arguing the Anti-Assignment Clause only applied to the assignment of "rights" under the Policies and not to claims for damages "for FSL's wrongful behavior."[99] And, even if the clause applied to claims against FSL arising from the RVI Policies, Plaintiffs contend their claims against FSL's subsidiaries and their claims arising from the Forfeiture Agreements validly were assigned, so wholesale dismissal of ACA Plaintiff is not warranted. As to Defendants' claim splitting argument, Plaintiffs argue the claims in other jurisdictions asserted "property-specific" claims involving different parties and

---

[98] Defendants also argued ACA Plaintiff's claims on behalf of two entities must be dismissed under the doctrines of waiver and *res judicata* because two of the purported assignor entities previously brought similar claims against FSL in Texas federal court and those claims were dismissed with prejudice. Plaintiffs conceded those claims were barred and indicated an intent to file an amended complaint omitting claims on behalf of those entities. In light of the dismissal of ACA Plaintiff on the basis of standing, the need for an amended complaint on this point is moot.

[99] Pls.' Ans. Br. in Opp'n. to Defs.' Mot. to Dismiss the Claims of Pl. ACA FSL Holdingco, LLC (hereinafter Pls.' Answ. Br. in Opp'n to Defs.' Mot. to Dismiss) at 4.

raised in response to claims or actions of the Property's purported purchaser. Accordingly, Plaintiffs contend the claims are distinct and not barred by the doctrine against claim splitting.

Questions of standing are addressed to *who* is entitled to pursue a claim, not whether that claim is meritorious. In order to have standing, the party seeking to pursue a claim must have the right to invoke the jurisdiction of a court to enforce the claim or redress the grievance.[100] Where, as here, a party is not contending the court lacks subject matter jurisdiction to grant relief to any plaintiff, but rather is contending the court cannot grant relief to a particular plaintiff, the motion properly is analyzed under Rule 12(b)(6) on the theory that "the plaintiff has failed to plead a necessary element of a cognizable claim . . . ."[101] In deciding a Rule 12(b)(6) motion, this Court (i) accepts as true all well-pleaded factual allegations in the complaint; (ii) credits vague allegations if they give the opposing party notice of the claim; (iii) draws all reasonable factual inferences in favor of the non-movant; and (iv) denies dismissal if recovery on the claim is reasonably conceivable.[102]

---

[100] *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994) (citing *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378 (Del. 1991)).
[101] *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1285 (Del. 2007).
[102] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

As a general rule, only parties to a contract or intended third-party beneficiaries have the right to pursue a claim under the contract.[103] Unless prohibited by a contract's terms, however, a contracting party may assign its rights to a third party. A valid assignment conveys to the assignee standing to pursue a claim arising under the contract.

Delaware is a contractarian state and recognizes contracting parties' right to limit a contract's assignability.[104] When restrictions on assignment are clear and unambiguous, Delaware courts will enforce them.[105] On the other hand, the free assignability of contracts is viewed as modern and economically desirable. Delaware therefore construes anti-assignment clauses narrowly and distinguishes between clauses restricting the *power* to assign and those restricting the *right* to assign.[106] A clause that restricts the power to assign is one that expressly provides that any subsequent assignment will be void or invalid.[107] In the absence of such language, an anti-assignment clause only limits a right to assign. In such a case, any

---

[103] *NAMA Holdings LLC v. Related World Mkt. Ctr.,* LLC, 922 A.2d 417, 434 (Del. Ch. 2007) ("As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions.").

[104] *Southeastern Chester Cnty. Refuse Auth. v. BFI Waste Servs. Of Pennsylvania, LLC*, 2017 WL 2799160, at *5 (Del. Super. Jun. 27, 2017); *Paul v. Chromalytics Corp.*, 343 A.2d 622, 625 (Del. Super. July 22, 1975).

[105] *Paul*, 343 A.2d at 625.

[106] *Southeastern Chester Cnty. Refuse Auth.*, 2017 WL 2799160, at *5; *In re Woodbridge Gp. of Cos. LLC*, 606 B.R. 201, 205 (D. Del. 2019).

[107] *Southeastern Chester Cnty. Refuse Auth.*, 2017 WL 2799160, at *5.

assignment will be valid and enforceable but will create in the non-assigning party a right to pursue a claim for breach of the anti-assignment clause.[108]

Here, the Anti-Assignment Clause's plain language provides that any purported assignment of the RVI Policies without FSL's consent shall be "null and void *ab initio*." The clause expressly and unambiguously restricts the Assignors' power to assign and is enforceable under Delaware law. ACA Plaintiff, however, argues the Anti-Assignment Clause merely precludes the Assignors from assigning their "rights under the Policies," and the purported assignments in this case only assigned Assignors' "claims for damages for FSL's wrongful behavior" rather than "FSL's obligations under the Policies."[109] In support of this argument, ACA Plaintiff points to the exceptions to the Anti-Assignment Clause, which ACA Plaintiff contends refer only to assignments of coverage rights that exist before FSL pays a policy claim. In addition, ACA Plaintiff cites Section V of the Policy, which pertinently provides that (a) FSL has no obligations other than making a payment to a Lender if a claim is made, and (b) upon payment of a claim, "all coverage under this Policy terminates."[110] The net effect of these provisions, ACA Plaintiff argues, is to signal the parties' "obvious intent" to only prohibit assignments that occurred before FSL paid a lender's claims.[111]

---

[108] *Id.*
[109] Pls.' Answ. Br. in Opp'n. to Defs.' Mot. to Dismiss at 4.
[110] *Id.* at 13.
[111] *Id.*

28

ACA Plaintiff contends this interpretation of the Anti-Assignment Clause is consistent with the Restatement (Second) of Contracts § 322. That Section states:

> (1) Unless the circumstances indicate the contrary, a contract term prohibiting assignment of "the contract" bars only the delegation to an assignee of the performance by the assignor of a duty or condition.
>
> (2) A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested,
>
> > (a) does not forbid assignment of a right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation;
> >
> > (b) gives the obligor a right to damages for breach of the terms forbidding assignment but does not render the assignment ineffective;
> >
> > (c) is for the benefit of the obligor, and does not prevent the assignee from acquiring rights against the assignor or the obligor from discharging his duty as if there were no such prohibition.

Citing the Restatement, ACA Plaintiff argues the Anti-Assignment Clause does not apply to assignment of a claim for breach of contract or a claim arising out of the insureds' performance of their entire obligation under the RVI Policy. In other words, relying on Section 322(2)(a), ACA Plaintiff argues the insureds freely could assign their right to receive damages for FSL's alleged breach of contract.

ACA Plaintiff's arguments are not persuasive. First, the contention that the Anti-Assignment Clause only applies to assignments made before FSL paid a claim contradicts the clause's plain terms. Had the parties intended to create such an exception to the restriction on assignment, they would have expressly drafted

language to that effect. The existence of the other enumerated exceptions in Section VIII compels the conclusion that those are the only exceptions to the Anti-Assignment Clause. The parties are bound by the plain language contained in their agreement.

Second, Restatement (Second) Section 322 does not allow the Assignors to assign the claims at issue in this case. The parties have not cited any decisions by this Court, the Court of Chancery, or the Delaware Supreme Court directly addressing the scope and application of Section 322. But the authorities the parties cite largely do not support ACA Plaintiff's interpretation. In a case arising from the bankruptcy of the Woodbridge Group of Companies, the Delaware Bankruptcy Court and the United States District Court for the District of Delaware held that Section 322 "merely requires, like Delaware law, that [anti-assignment provisions] be unambiguous."[112] In *Woodbridge*, the anti-assignment clause at issue (i) prohibited assignment of any rights without prior written consent, and (ii) stated any attempted assignment without consent would be null and void.[113] The District Court held that such language "manifest[ed] . . . a clear intention to forbid assignment of the Promissory Note itself and any rights thereunder" and therefore fell within Section 322(2)'s exception for contract terms "manifesting a different intention."[114]

---

[112] *In re Woodbridge Gp of Cos., LLC*, 606 B.R. 201, 207 (D. Del. 2019). *See also In re Woodbridge Gp. of Cos., LLC*, 590 B.R. 99 (Del. Bankr. 2018).
[113] *In re Woodbridge Gp of Cos., LLC*, 606 B.R. at 207.
[114] *Id*.

Similarly, in *BRDL, LLC v. RD Legal Funding, LLC,*[115] a New Jersey appeals court interpreted an anti-assignment clause that (i) prohibited assignment of the agreement or any of its rights or obligations, and (ii) stated that any purported assignment would be void. Applying Delaware law, the New Jersey court held that clause effectively denied the purported assignee the right to assert the assignor's payment claims under the contract.[116] The Court concluded the anti-assignment language manifested a clear intent to forbid assignment of the agreement and any rights thereunder and therefore fell within the exception to Restatement Section 322(2).

ACA Plaintiff, however, relies on a decision of the United States District Court for the Southern District of New York, in which that court held the anti-assignment clause at issue only restricted a party's power to assign rights and duties under the agreement, and did not unambiguously refer to or preclude assignment of claims for damages. In *Partner Reinsurance Co. Ltd. v. RPM Mortgage, Inc.,*[117] the court construed an anti-assignment clause that (i) prohibited assignment or delegation of any party's rights or obligations under the merger agreement, and (ii) stated that any attempted assignment would be void.[118] Applying Delaware law, the *Partner Reinsurance* court held that the anti-assignment clause did not prohibit

---

[115] 2021 WL 1499955 (N.J. Super. App. Div. Apr. 16, 2021).
[116] *Id.* at *4.
[117] 2021 WL 2716307 (S.D.N.Y. July 1, 2021).
[118] *Id.* at *2.

assignment of claims for damages for breach of contract.[119] The Court distinguished the *Woodbridge* cases as involving claims other than breach of contract and rejected a broad rule that "null and void" language in anti-assignment clauses manifests a clear intent to preclude assignment of damages claims under Restatement (Second) Section 322(2).[120]

*Partner Reinsurance* does not provide persuasive support for ACA Plaintiff's contention that the Anti-Assignment Clause did not preclude the assignments at issue here. First, the purported assignments in this case were not expressly or even impliedly limited to damages claims for breach of contract. Rather, the Assigned Claims give ACA Plaintiff all "right, title and interest in and to any and all claims . . . arising from or relating in any manner to (i) the RVI Policies or the enforceability or absence thereof . . . (iii) the Loan Documents or the enforceability or the absence thereof; and (iv) the acts or omissions of FSL or any Nominee in respect of any matter or thing comprehended in [the preceding clauses]." Nothing in the text of the Assigned Claims is limited to breach of contract claims or damages claims.

Second, and relatedly, ACA Plaintiff seeks much more in this action than simply damages for breach of contract. The relief sought includes (i) requests for a declaratory judgment regarding the proper interpretation of the RVI Policies and the

---

[119] *Id*. at *8.
[120] *Id*. at *8-9.

Loan Documents; (ii) a judicial declaration that certain documents are void; and (iii) a declaration that all the applicable Loan Documents were paid in full and satisfied when FSL or its nominee made payments under the RVI Policies, such that neither FSL nor its nominees acquired any valid indebtedness or other rights.[121] In addition, ACA Plaintiff joins the Borrower Plaintiffs in their claim that Defendants violated unspecified "Insurance Laws and Doctrines."[122] Therefore, even if the Court followed the *Partner Reinsurance* case, the purported assignments would be void because they attempted to assign far more than a damages claim based on alleged breaches of contract.

Moreover, the purported assignments did not exclusively assign all the Assignors' rights as to the Assigned Claims. Rather, the Assignors reserved for themselves "any rights or claims . . . against any alleged purchaser or other transferee for value of any rights under the ICA or any Loan Documents from FSL or any Nominee . . . ."[123] Permitting ACA Plaintiff to pursue claims against FSL while allowing the Assignors to bring the same or similar claims against FSL's transferees would result in claim-splitting and create a genuine risk of inconsistent verdicts. It also could subject FSL or its nominees to double-liability if the transferees bring third-party claims against FSL. A risk of inconsistent verdicts or double-liability is

---

[121] Compl. ¶ 138.
[122] The nature and validity of this claim remains unclear to the Court, but it is not the subject of the pending motions.
[123] Compl. Ex. B.

precisely the result that anti-assignment clauses seek to avoid.[124] This factor further supports the conclusion that the purported assignments violated The Anti-Assignment Clause's letter and intent.

Finally, ACA Plaintiff makes two other arguments in an effort to maintain a foothold in this action. First, ACA Plaintiff argues that "fully half" its claims relate to the Forfeiture Agreements, as opposed to the RVI Policies, and the Anti-Assignment Clause does not apply to the Forfeiture Agreements. This argument does not withstand scrutiny. The Forfeiture Agreements did not create rights for the Assignors; those agreements contain covenants and warranties given by the Assignors to FSL.[125] And all four of ACA Plaintiff's claims in the Complaint relate largely or entirely on the RVI Policies and the parties' rights and obligations thereunder. Count I seeks a declaratory judgment, *inter alia*, that (i) the options contained in the RVI Policies were not effectively exercised, (ii) the Loan Documents were retired by the payments made under the RVI Policies, (iii) FSL breached the RVI Policies, and (iv) various provisions in the RVI Policies are void.[126] Count II is a breach of contract claim premised on alleged breaches of the

---

[124] Restatement (Second) Contracts § 322, cmt. a ("A term in a contract prohibiting assignment of the rights created . . . may serve to protect the obligor from conflicting claims and the hazard of double liability."). *See also J.L. v. Barnes*, 33 A.3d 902, 918 (Del. Super. June 17, 2011) (The doctrine against claim splitting is "designed to prevent a litigant from getting 'two bites at the apple.'").

[125] *See* Compl. Ex. A, "Insured Covenant Agreement" Section 5(a)-(m) Representation, Warranties and Covenants of Owner.

[126] Compl. ¶ 138.

terms and implied covenants contained in the RVI Policies.[127] Count III alleges the RVI Policies violate insurance laws or policies.[128] Count IV alleges Defendants were enriched unjustly by the premiums and other benefits received from the Assignors.[129] Absent a valid assignment of the Assignors' rights under the RVI Policies, ACA Plaintiff could not maintain any of its causes of action.

ACA Plaintiff's second argument fares no better. ACA Plaintiff alleges its claims "include numerous causes of action" against FSL's subsidiaries that took title to the Loan Documents and properties. But the only FSL subsidiaries named as defendants are the FSL nominees that acquired the Borrower Plaintiffs' loans.[130] And, for the reasons set forth above, even if ACA Plaintiff amended its complaint to name the other subsidiaries or nominees, it could not maintain a cause of action against them unless it validly was assigned rights under the RVI Policies, which did not occur. Accordingly, ACA Plaintiff lacks standing to maintain any of the claims alleged in the Complaint.

---

[127] *Id.* ¶¶ 140-41.
[128] *Id.* ¶ 146.
[129] *Id.* ¶ 151.
[130] *Id.* ¶¶ 30-32; Defs.' Reply Br. in Further Supp. of their Mot. to Dismiss the Claims of Pl. ACA FSL Holdingco, LLC (hereinafter Defs.' Reply Br. in Supp. of Mot. to Dismiss) at 7-8.

### III. Plaintiffs' Motion to Strike Affirmative Defenses is granted in part and denied in part.

A motion to strike affirmative defenses is governed by Superior Court Civil Rule 12.[131] Such a motion will be granted only where the facts viewed most favorably for the defendant, "cannot, as a matter of law, support the affirmative defense[.]"[132] Defendants raise eleven affirmative defenses in response to Plaintiffs' Complaint, but Plaintiffs take issue with three of those defenses. In response to Plaintiffs' Motion, Defendants withdrew their laches defense. For this reason, Plaintiffs' Motion to Strike Defendants' Affirmative Defenses as to the laches defense is granted.

#### A. The Court cannot dismiss Defendants' estoppel defense at this stage of the proceedings.

With respect to their affirmative defense of estoppel, Defendants aver in their Answer and Counterclaim that "[p]laintiffs' claims are barred, in whole or in part, because Plaintiffs are estoped by their own conduct from recovering for the causes of action alleged."[133] Plaintiffs moved to strike this defense, contending Defendants appear to be asserting an unclean hands defense, which arises only in equity.[134]

---

[131] Super. Ct. Civ. R. 12, Defenses and Objections – When and How Presented – By Pleading or Motion – Motion for Judgment on Pleadings.

[132] *N.K.S. Distribs., Inc. v. Wheeler, Wolfenden & Dwares, P.A.*, 2014 WL 4793438, at *3 (Del. Super. Sept. 26, 2014) (citing *Stinnes Interoi, Inc., v. Petrokey Corp., Diamond Indus., Inc.*, 1983 WL 412258, at *1 (Del. Super. May 23,1983)).

[133] Answ. and Countercl. at 58.

[134] Pls.' Mot. to Strike at 3.

Defendants resist this characterization of their estoppel defense. First, Defendants point out that estoppel expressly is enumerated as an available defense in Delaware Superior Court Civil Rule 8(c) and routinely applied by this Court and other courts at law.[135] Defendants explain their defense is based on their theory that Plaintiffs are estopped from claiming Defendants paid off the loans under the RVI policy, therefore extinguishing Plaintiffs' obligations, because Plaintiffs separately have behaved as though Defendants did *not* pay off the loans or extinguish the Plaintiffs' obligations thereunder.[136]

Although Plaintiffs may believe this estoppel defense actually is unclean hands in disguise, that concern is not a sufficient basis to strike the defense at this stage of the proceedings. Estoppel unquestionably is a cognizable defense in a court of law,[137] and Defendants are entitled to pursue it.[138] The sufficiency of the factual basis for this defense must await further development through discovery.

### B. An *in pari delicto* defense successfully may be raised in this Court.

Plaintiffs separately contend Defendants' *in pari delicto* defense must be stricken. The defense of *in pari delicto* is defined as "'a general rule that courts will

---

[135] Defs.' Resp. to Pls.' Mot. to Strike at 2. *See also* Sup. Ct. Civ. R. 8(c); *Borders v. Townsend Assocs.*, 2002 WL 725266, *5 (Apr. 17, 2002); *Carter v. State Bureau of Child Support Enf't*, 444 A.2d 271, 274 (Del. Super. Feb. 3, 1982); *Liberty Mut. Ins. Co. v. Progressive Classic Ins. Co.*, 2007 WL 2306971, at *5-6 (Del. Super. Jul. 23, 2007).
[136] Defs.' Resp. to Pls.' Mot. to Strike at 3.
[137] *Borders v. Townsend Assocs*. 2002 WL 725266, *5 (Del. Super. Apr. 17, 2002).
[138] Sup. Ct. Civ. R. 8(c).

not extend aid to either of the parties to a criminal act or listen to their complaints against each other but will leave them where their own act has placed them.'"[139] Under this rule, "'a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in.'"[140] Plaintiffs argue *in pari delicto* "sound[s] in equity" and therefore cannot be heard by this Court.[141] Plaintiffs rely on a single decision of this Court to support their position.[142] In response, Defendants cite numerous cases in which this Court has heard and adjudicated the defense of *in pari delicto*.[143]

Although Plaintiffs have identified one case holding *in pari delicto* "cannot be heard by this Court,"[144] there are numerous examples of that defense being successfully raised in this Court.[145] The single authority on which Plaintiffs rely

---

[139] *N.K.S Dist., Inc., P.A.,* 2014 WL 4793438 at *4 (quoting *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 882 (Del. Ch. 2009)).

[140] *Id.* (quoting *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 883 (Del. Ch. 2009)).

[141] Pls.' Mot. to Strike at 3.

[142] *Id.*

[143] Defs.' Resp. to Pls.' Mot. to Strike at 4.

[144] *Columbus Life Ins. Co. v. Wilmington Trust Co.*, 2021 WL 537117, *10 (Del. Super. Feb. 15, 2021).

[145] *See, e.g., Preferred Fin. Servs. v. A&R Bail Bonds LLC*, 2019 WL 315331, *17 (Del. Super. Jan. 23, 2019) ("For the foregoing reasons, the Court **ADOPTS** the Commissioner's ruling that the Agreement is illegal and unenforceable, and will apply the doctrine of *in pari delicto* to leave the parties where the Court finds them."); *Burns v. Ferro*, 1991 WL 53834, *2 (Del. Super. Ct. Mar. 28, 1991) ("Where parties to a contract are in *pari delicto,* a court will 'leave them where it finds them,' and will refuse to enforce the contract."); *Loper v. Loper*, 170 A. 804, 807 (Del. Super. Jan. 22, 1934) ("The deductions and conclusions are inescapable. The parties are *in pari delicto*."); *Morford v. Bellanca Aircraft Corp.*, 67 A.2d 542, 547 (Del. Super. Ct. Apr. 27,1949) ("[T]he

does not engage in a substantive analysis explaining its conclusion or reconciling its decision with contrary Superior Court precedent. Plaintiffs also do not explain, beyond their *ipse dixit* statement, why this defense sounds in equity. At least at this early stage of the case, this defense need not be stricken.

## CONCLUSION

For the reasons articulated above, the Defendants' Motion to Strike Plaintiffs' Jury Demand is **DENIED WITHOUT PREJUDICE** to Defendants renewing this motion after discovery, and Defendants' associated fee-shifting request is **DENIED**. The Defendants' Motion to Dismiss Plaintiff ACA FSL Holdingco, LLC is **GRANTED**. Finally, Plaintiffs' Motion to Dismiss Defendants' Affirmative Defenses is **GRANTED** as to the laches defense and otherwise is **DENIED. IT IS SO ORDERED.**

---

authorities are practically unanimous in saying that, where parties are *in pari delicto*, a Court will leave them where it finds them.").